## TIPPER v. NORTHERN PAC. RY. CO. (POWERS et al., Interveners).

### No. 1283.

District Court, W. D. Washington, N. D.

Aug. 20, 1945.

The plaintiff, Raymond R. Tipper, a veteran of World War I, in November, 1942, voluntarily enlisted in the armed forces of the United States. At the time of his enlistment, he was forty-six years of age, and was an employee of the Northern Pacific Railway Company, as a mechanic. He had attained a position in seniority of No. 9 from the top of his group. Under Selective Service Regulations promulgated subsequent to his enlistment, he was entitled, being over thirty-eight years of age, to be classified in a reserve status and allowed to engage in essential war work in a civilian capacity, but subject to recall to active military duty, should conditions require that this be done.

The plaintiff sought to have the defendant, Northern Pacific Railway Company, certify to the Army that his services were required by it in his former capacity. Such request was not made by the Railway Company, but he was granted release from active military service, and placed in a reserve status in order to enter civilian employment with the Puget Sound Navy Yard at Bremerton, Washington. He continued in this work until some time early in 1945, during all of which time he was subject to the orders and under the jurisdiction of his local draft board. Early in 1945 he was given an honorable discharge from military service by the Army, and he, thereafter, within the ninety day period provided by law, made a formal request for reinstatement with his former employer, the defendant herein. This request was denied on the ground that it had not been timely presented. The defendant and the intervenors, who were those members of the Union whose seniority would be affected by reinstating the plaintiff, took the position that the plaintiff, in order to preserve his rights under the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq., should have made his request within ninety days after his release from active military service.

The question presented is whether the release from active service and the classification in reserve status is intended to apply, by the Selective Training and Service Act, or whether the time begins to run when a final discharge from military service is granted.

J. Charles Dennis, U. S. Atty., John E. Belcher, Asst. U. S. Atty., and Captain Patrick Henry Winston, State Director, Selective Service System, all of Seattle, Wash., for plaintiff.

Robert S. Macfarlane and Earl F. Requa, both of Seattle, Wash., for defendant.

Samuel B. Bassett, of Seattle, Wash., for intervenors.

George E. Flood, of Seattle, Wash., for American Legion, amicus curiae.

LEAVY, District Judge.

I appreciate the arguments that have been made by counsel representing the parties here, and likewise the argument of Mr. Flood, appearing amicus curiae, and I appreciate also the importance of this case, not alone to the plaintiff, but to perhaps hundreds and thousands of men who have been or who are now in the service and will be discharged. I am conscious also of the fact that this case will be one of first impression, and is therefore of great importance.

I want to say further, at the outset, that there certainly can be no charge of a lack of that high degree of patriotism, that perhaps right now, due to the ending of the Japanese war, is more in evidence than during ordinary periods. No one can challenge the defendant corporation Northern Pacific Railway Company for taking the position they have in contesting this issue, nor can anyone challenge the various employees of the union, taking the position that they have, because the matter does not turn upon a question of who is the more patriotic. It must be determined purely from an objective basis, and for the purpose of giving a construction such as the framers of this Act intended should be given to it, so that its objectives and purposes might be accomplished.

█ I do not intend to review in detail the facts in this case, because there is scarcely any disagreement concerning them. The question is more one of an interpretation of the statute and the regulations that have been promulgated, based upon that statute. We must review, to a degree at least, the Selective Training and Service law, and just what Congress had in mind in the matter of insuring to those people who fell within the provisions of the Act and were called to the Colors, even before we had gone into the war. As I have already indicated, the Act and the regulations made thereunder, must be liberally construed, but such liberal construction, of course, should not be carried to the point where it does violence to the Act itself.

When the Selective Training and Service Act was first passed by Congress, it fixed a minimum age of 21 years, as I recall, and it seems to me, though I may be in error, that the maximum age was 45 for service. It might have been less than that. We were at peace, and the discussions in the Congress were extensive. The proponents advocated reasons for the necessity of a peacetime draft from almost every conceivable angle, and the opponents with an equal degree of vigor, eloquence and logic, opposed a peacetime draft. At any rate, this issue as to whether the man who came under the provisions of the Act and who was taken into the service, should or should not lose anything in the way of a job that he had, was discussed at great length. I feel that I ame safe in saying that if anyone would care to review the debates, and the reports of the committees of both houses of Congress, that the sum and substance of that feature of the Act was that the man who was called to service shoud not be prejudiced in any way when he came out of the service, in the matter of his occupation. Later, the Act was amended just a few months before we got into the war, and instead of a 12 months' service and a long period of reservability, the 12 months' provision was virtually taken out of the Act, because it perhaps was more or less imminent to those in authority that the world was moving at such a rapid pace toward war, that we were apt to become involved, or at least the threat was so serious that changes in the Act were demanded, and then the Act was again changed to include 18-year olds—dropped from 21. Because of the tremendous field of human activity and citizenship responsibility that was covered by this exceptional and unusual legislation, great powers were conferred upon those who it provided should execute the law, and the regulations promulgated became law themselves.

█ In construing the Act as it now exists and applies to this particular case, this Court does give great weight and consideration to the regulations of the Director of Selective Service. While not being able to look to them as a precedent, nevertheless, if it can be read into them or out of them just exactly what the intent was when issued, why certainly that intent should be given expression not only with the many Selective Service and Training regulations put into effect, but the War and Navy Departments' orders and other emergency agencies that came into this war picture, which promulgated directives and regulations and orders from time to time concerned either directly or indirectly with this identical question that we have here.

After we became engaged in the war, draft numbers or the calls to the service were increased tremendously—millions were

being called where it had only been expected that hundreds of thousands might be called in the first instance, and the country found itself confronted with tremendous economic problems. Its difficulties grew almost daily as to how it was going to meet the civilian responsibility of carrying on such a war. Then we find this regulation about men 38 years old and beyond that age—and it is not necessary in deciding this matter to cite the numerous regulations from the Man-power Commission and the War Labor Board and the other emergency agencies. Suffice it is to say, that under the regulation that permitted a man past the age of 38 to relieve himself from responsibilities that were incident to active military service at the time, he had to do certain things. I want to briefly refer to some of the exhibits here, because it seems to me they throw considerable light on this situation.

It might be argued that the plaintiff should have discussed more fully with the executive officials of his union and his employer, his plan to re-enter the service. Be that as it may, he did go into the service; he was accepted, and after taking the oath of a soldier and commencing his training, he received this communication, which is in evidence here as Plaintiff's Exhibit 2, and I shall only read the one paragraph of it:

"This letter will grant to you an indefinite leave of absence for that purpose, with the requirement that you will return to the service of the Northern Pacific Railway Company within 40 days after your honorable discharge from military service. Leave of absence effective November 19, 1942".

When the new regulations were issued by the War Department that recognized the possibility of a discharge, or of a release from active service for men over 38, early in 1943, we have the next letter of the plaintiff to the defendant. He took the course as advised by some of his superiors in the Army. He applied to his employer for some sort of a written showing that his services were needed on the job that he had held before he went into the service with the railroad company, and he received in reply Plaintiff's Exhibit 5, which is signed by the Roundhouse foreman, and which advises him, under date of April 29, 1943:

"Your letter was received. I am sorry to say at this time it will be impossibe to grant your request, as you went into the army at your own request, so do not feel justified in asking for your return."

Because of the language of this particular letter that I have just read, I am sure that if the request had been made or brought to the attention of the executive officials of the defendant railway company or the executive officials of this plaintiff's union, they would not have taken such an arbitrary attitude. Without any challenge whatever to the plaintiff's patriotism, but rather as an indication of his good faith and his high degree of patriotism which was the motivating cause of his going into the service at a great financial sacrifice to himself, he was persuaded under this new regulation he could serve his country better in a civilian capacity, even though he would have to submit to certain restrictions from the military, and when his employer refused, thus summarily to ask his transfer back into his former status, why he took the next step open to him and was given a certificate that permitted him to go into the Bremerton Navy Yard, as a civilian employee.

Some argument is made that this work in the Navy Yard was not necessarily classified under the terms of essential industry, but was rather a governmental war activity. I am convinced that it would readily fall under an essential war industry, but even then, according to the record as made here, the plaintiff sought, after having gone into this work at the Bremerton Navy Yard, to get back his place in the employ of the railway company.

I am accepting the undisputed evidence of the plaintiff himself, and he was advised—whether the person had any authority to so advise him or not, but he testifies it was some one connected with the personnel division of the Navy Yard—that if he left there and went back over to the railway company, his draft board would immediately return him to his status of active military service. We can well take the position that they might not have done that, and probably couldn't have done so. Nevertheless, when we test the good faith of this veteran, it seems to me that he acted just as any other person would have acted under like circumstances.

I am conscious of the fact that standing alone, one paragraph of the Selective Service and Training Regulations would clearly require that the plaintiff must have made his application within 90 days, follow-

ing his release from active military service, otherwise he would be barred, but we can not single out one regulation and consider that standing alone. It is so evident to this Court by a reading of Defendant's Exhibit A–2, entitled "Information Concerning the Veterans' Assistance Program" of the Selective Service System, that we must consider all the regulations, together. This document reads:

"When it is claimed that a veteran has waived his re-employment rights, the waiver must be proved by clear and positive evidence." Such proof is not found in this record.

In light of what I have said, and I do not intend to even remotely imply there was any fraud or any overreaching, intentionally or willfully by the language that I just read, but I am convinced by that alone, it was intended there should be a most liberal construction given to the act and all regulations and directives to the end each man or woman who answered their country's call in a period of great crisis, should not find himself or herself at the conclusion of such service, in a position where they were at a disadvantage, or prejudiced by reason of having given such service.

Fortunately in this case, none of the union members are made to suffer a reduced status in the matter of seniority lower than that they had when plaintiff entered the military service even when he is restored to his former position as an employee, because had he not voluntarily gone forward when he did enter the service, he would have kept the status that he now seeks, and would not have even gone beyond nine from the top on the seniority list, since that is where he was when granted his leave; that is where he goes again, no one having dropped out or come into the service above him. Really there are no rights of anyone who is junior to this applicant being prejudiced. If there is anything in the contract of employment between the railroad company and the union that runs counter to a liberal construction of the language of these various Acts or regulations, such matters would have to give way and take a subordinate place in the determination of issues such as we have here.

From what I have said, I am convinced that under all of the facts in this case, and under the law as I see it, the plaintiff must prevail and the defendant railroad company will be required to restore him to his status of an employee that he had when he left their service, to answer the call of his country. The Act itself contemplated, in spite of certain apparent inconsistencies in the regulations and War Department orders, that the word "service" means a termination of such responsibility, by a discharge. That was not until a period here indicated by plaintiff's exhibit No. 1, on March 19, 1945. His application for reinstatement was well within the time allowed by law.

You may prepare and submit findings and a judgment along the lines that have been indicated by the Court.